# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br>vs.<br><br>MISAEL SAQUEO LOPEZ-TUBAC,<br><br>Defendant. | No. CR18-3020-LTS<br><br>**ORDER ON REPORT AND RECOMMENDATION** |

This matter is before me on a Report and Recommendation (R&R) (Doc. No. 29) in which the Honorable C.J. Williams, Chief United States Magistrate Judge, recommends that I deny defendant's motion (Doc. No. 22) to suppress evidence stemming from a traffic stop on May 8, 2018. Defendant Misael Saqueo Lopez-Tubac (Lopez-Tubac) filed timely objections (Doc. No. 39) on August 8, 2018.

## I. BACKGROUND

### A. *Procedural History*

On June 6, 2018, the grand jury returned an indictment (Doc. No. 2) charging Lopez-Tubac with four counts of unlawful use of identification document in violation of 18 U.S.C. § 1546(a) and four counts of misuse of a social security number in violation of 42 U.S.C. § 408(a)(7)(B). On July 5, 2018, Lopez-Tubac filed a motion (Doc. No. 22) to suppress evidence obtained as a result of a traffic stop on May 8, 2018. The Government filed a resistance (Doc. No. 24) on July 12, 2018. Judge Williams held a hearing on July 18, 2018. At the hearing, the Government presented testimony from Deportation Officer (DO) Bryce Callison with Immigration and Customs Enforcement (ICE). Doc. No. 25. Judge Williams admitted six Government exhibits. *See* Doc. Nos.

24-2 through 24-7. Lopez-Tubac asserted an additional basis for the motion at the hearing and the parties were allowed to submit supplemental briefing on the issue. Doc. Nos. 26, 27.

Judge Williams issued his R&R (Doc. No. 29) on July 26, 2018. Lopez-Tubac filed timely objections (Doc. No. 39) on August 8, 2018. Lopez-Tubac has entered a conditional plea of guilty to Count 1 of the indictment. *See* Doc. No. 33.

**B.**     *Relevant Facts*

Judge Williams summarized the following relevant facts in his R&R based on the exhibits and testimony presented during the suppression hearing:

> In January, 2017, authorities in Bremer County, Iowa alerted immigration officials to the presence of an immigrant (target) who was present in the country illegally. The target had been previously removed from the United States in 2011. From the target's past removal record, Immigration and Customs Enforcement (ICE) Deportation Officer (DO) Bryce Callison was able to obtain the target's height, weight, eye color, hair color, and a booking photograph from 2011. The record indicated that the target was sixty-three inches tall, weighed 187 pounds, had brown eyes, and brown hair. Bremer County authorities alerted ICE that the target had been arrested for drunk driving. No photograph from the January 2017, arrest was provided. The address on the vehicle registration matched the address the target provided at the time of his arrest. The address was to a home in a mobile home court located in Waterloo, Iowa.
>
> In February 2017, DO Callison completed the required paperwork to allow him to conduct surveillance and arrest the target. DO Callison made contact with the manager of the mobile home court shortly thereafter and inquired as to whether the target lived in the mobile court. After viewing the photograph from the target's 2011 removal, the manager confirmed that the target lived in the mobile home court at the address the target gave officers at the time of his January 2017 arrest.
>
> Between February, 2017 and May, 2018, ICE agents attempted to locate and arrest the target multiple times. In March of 2018, ICE agent conducting surveillance of the target residence identified the vehicle associated with the target from the previous drunk driving arrest. On the

morning of May 8, 2018, DO Callison again conducted surveillance of the target's residence, backing his vehicle into a parking spot so that the front of his vehicle was facing the direction of the target's home, although DO Callison did not have a direct view of the home. At approximately 6:20 AM on May 8, 2018, while conducting surveillance at the target residence, DO Callison observed a vehicle arrive and park on a street in front of the target residence. DO Callison was positioned such that the vehicle stopped in front of DO Callison with the front of that vehicle facing to DO Callison's right. The target residence was on the far side of the vehicle. DO Callison observed defendant approach the recently arrived vehicle from the direction of the target residence. Defendant crossed behind the recently arrived vehicle, passed between the recently arrived vehicle and DO Callison, and entered the recently arrived vehicle on the passenger side. DO Callison estimated that defendant passed within 30 feet of him.

DO Callison believed defendant to be the target. DO Callison believed defendant matched the approximate height and weight of the target, and that his face appeared similar to the target.

DO Callison followed the recently arrived vehicle as it departed the area of the target residence. DO Callison radioed for assistance and initiated a stop of the vehicle after following defendant for approximately ten minutes. Once stopped, DO Callison approached the driver-side of the target vehicle. DO Callison identified himself as an immigration officer and spoke directly to defendant, who was seated on the passenger side. DO Callison initially spoke English, but switched to speaking Spanish when he realized defendant could not understand him well enough to answer questions. DO Callison requested defendant's name, asked defendant what his country of citizenship was, and inquired as to whether defendant had permission to be in the United States. During this time, the supporting agents arrived on scene. Defendant identified himself as Misael Saqueo Lopez-Tubac, stated that he was a citizen of Guatemala, and stated that he did not have permission to be in the United States. A supporting agent asked to see defendant's identification. Defendant produced a Guatemalan consular identification card. The consular identification card matched the name defendant gave to DO Callison. To confirm that defendant was not the target, supporting agents took defendant's fingerprints and input them into ICE's computerized system. The system confirmed that defendant was not the target, but indicated that defendant had been previously charged with an immigration offense. Defendant was administratively arrested and taken to the ICE office in Cedar Rapids, Iowa, for further processing.

While defendant was fingerprinted, DO Callison questioned the driver. The driver was a Hispanic male and did not resemble the target. The driver indicated that he and defendant were on their way to work. The driver identified their place of employment as a business in Shell Rock, Iowa. The driver was not fingerprinted or questioned regarding his background.

Once at the ICE office, defendant was questioned further and his belongings were inventoried. Among his belongings was a photographic employee identification card for the business in Shell Rock previously identified by the driver. ICE agents contacted this business and obtained defendant's employment paperwork, including a W-4 tax form, a Form I-9, and photocopies of a permanent resident card and a social security card. Further investigation revealed that the social security number used by defendant at the business in Shell Rock was also used by defendant at other businesses. ICE agents obtained I-9 and W-4 forms from these businesses. Defendant was subsequently indicted and charged with multiple counts of unlawful use of identification documents and misuse of a social security card.

Doc. No. 29 at 2-5.

## II. STANDARD OF REVIEW

A district judge must review a magistrate judge's R&R under the following standards:

> Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1); *see also* Fed. R. Crim. P. 59(b). Thus, when a party objects to any portion of an R&R, the district judge must undertake a de novo review of that portion.

Any portions of an R&R to which no objections have been made must be reviewed under at least a "clearly erroneous" standard. *See, e.g.*, *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error"). As the Supreme Court has explained, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). However, a district judge may elect to review an R&R under a more-exacting standard even if no objections are filed:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 150 (1985).

### III. DISCUSSION

Lopez objects to the R&R on the following bases:

A. The court erred in finding DO Callison reasonably conflated Mr. Lopez-Tubac with ICE's target given the totality of the circumstances

B. The court erred in finding DO Callison's questioning of Mr. Lopez-Tubac did not constitute a custodial interrogation requiring *Miranda* warnings.

C. The court erred in finding the search and inventory of Mr. Lopez-Tubac's belongings was not a pretext for uncovering further incriminating evidence.

Doc. No. 39 at 2. These objections mirror the arguments Lopez-Tubac made in his motion to suppress. *See* Doc. No. 22. I will address each separately.

5

### A. *Conflating Target with Defendant*

Defendant argues the Government did not provide sufficient evidence that DO Callison had a particularized and objective basis to believe Lopez-Tubac was ICE's target. Specifically, he argues that Callison's testimony does not directly tie Lopez-Tubac to the address of the target because Callison "did not have a direct view of the home" and the home was located in a densely populated mobile home court. *See* Doc. No. 39 at 3. He further argues that Callison did not have a reasonable suspicion to believe the *target* could even be found at that residence because the target vehicle had not been seen during ICE agents' surveillance between February 2017 and March 2018. The target vehicle was also not present on May 8, 2018. *Id.* Lopez-Tubac notes that ICE agents also never attempted to verify with the mobile home court manager whether the target lived there any time after February 2017. *Id.*

Lopez-Tubac next attacks Judge Williams' finding that Callison reasonably relied on the physical similarities between Lopez-Tubac and the target. He argues that "[a]pparent Hispanic ancestry and the brown hair and brown eyes commonly associated with such ancestry are not sufficiently particular or objective to justify such a significant intrusion on the Fourth Amendment rights of Mr. Lopez-Tubac." *Id.* at 4. With regard to the particularized characteristics referenced by Callison, Lopez-Tubac argues that he and the target have significant differences, such as a 35-pound difference in weight, a two-inch difference in height and noticeably dissimilar facial features, such as the shape of their noses, eyes, jaw lines, and hair lines among other dissimilarities. He contends that Callison's mistake in identifying Lopez-Tubac as the target was not objectively reasonable.

Judge Williams found the physical dissimilarities were not so significant that it was unreasonable for Callison to believe that Lopez-Tubac was the target. Doc. No. 29 at 9. He noted that it is not reasonable to expect a law enforcement officer to discern a difference between sixty-one inches tall and sixty-three inches without a point of reference. *Id.* He also found that Callison could reasonably rely on the photograph of

the target given that the target was an adult when the photograph was taken and that a "seven year lapse is not likely to change his facial characteristics so significantly that identification would not be possible." *Id.* When allowing for changes in weight or the amount of facial hair that could occur over seven years, Judge Williams found Lopez-Tubac's appearance was not so dissimilar from the target that conflation of the two was unreasonable. *Id.* Based on the totality of the circumstances, Judge Williams concluded it was reasonable for Callison to believe Lopez-Tubac was the target and that any discrepancies in the physical characteristics were excused by "inherent imprecision of human perception in gauging an individual's height and weight without the aid of a fiducial element." *Id.* at 10.

"Reasonable suspicion requires that the officer's suspicion be based upon particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *United States v. Lopez-Mendoza*, 601 F.3d 861, 865 (8th Cir. 2010). Reasonable suspicion is based on the totality of the circumstances. *United States v. Morgan*, 270 F.3d 625, 630 (8th Cir. 2001). It is "a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence . . . ." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). A person's heritage alone cannot give rise to a reasonable suspicion that he is in the United States illegally, but it may be a "relevant factor" in forming a reasonable suspicion. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 886-87 (1975).

After having reviewed the evidence, including the exhibits and testimony from the suppression hearing, I agree with Judge Williams that it was not unreasonable for DO Callison to believe that Lopez-Tubac was the target. Lopez-Tubac approached the stopped vehicle from the direction of the target residence rather than the residence directly in front of Callison, the residence located next to the target residence or any of the other visible residences. While the target vehicle was not often seen at the residence during ICE surveillance, it was observed at one point in March 2018, giving Callison reason to

believe the target was still present at the residence. With regard to physical characteristics, I agree with Judge Williams that when viewed from a distance, any dissimilarities would not have been so apparent that it was unreasonable for Callison to believe that Lopez-Tubac was the target. Variances in height and weight are difficult to measure through observation alone without a point of reference. Moreover, an individual's weight may fluctuate over a seven-year time period. For these reasons, and the additional reasons set forth in the R&R, I find that Callison's stop of the vehicle was supported by a reasonable suspicion based on the totality of the circumstances.

### B.     *Questioning Defendant During Stop*

Lopez-Tubac argues that Judge Williams erred in concluding that DO Callison's questioning of Lopez-Tubac did not constitute a custodial interrogation requiring warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). He argues that because Callison testified he was able to confidently conclude that the driver of the vehicle was not ICE's target when looking at photographs of the two men side-by-side, he similarly should have been able to conclude that Lopez-Tubac was not the target when speaking with him face-to-face. He also argues that Callison's testimony demonstrates that he should have been able to quickly ascertain whether Lopez-Tubac was ICE's target, but instead asked questions "reasonably likely to elicit an incriminating response from" Lopez-Tubac regarding separate immigration and criminal-law violations. Doc. No. 39 at 5-6 (quoting *United States v. Briones*, 390 F.3d 610, 612 (8th Cir. 2004)). For instance, Callison testified that he inquired about Lopez-Tubac's name, immigration status and country of citizenship, but failed to request Lopez-Tubac's identification. *Id.* He contends that any responses Lopez-Tubac provided in response to Callison's questioning should be suppressed.

Judge Williams concluded that Callison's conduct during the stop was commensurate with what would be required to investigate an individual who was believed to be in the United States illegally and in violation of state criminal laws. *See* Doc. No.

29 at 11. He found that Callison's questions were reasonably tailored to determine whether Lopez-Tubac was the target of the investigation, for which he had information regarding the target's name, country of citizenship and immigration status. *Id*. Judge Williams explained that Callison was not obligated to take defendant's answers at face value and that his inquiry into Lopez-Tubac's identity did not end until ICE confirmed, via fingerprints, that Lopez-Tubac was not the target. He concluded: "ICE agents had every right to confirm the identity of defendant beyond defendant's self-reporting. ICE agents were not required to inform defendant of his rights while in the process of confirming the identity of defendant subsequent to a lawful vehicle stop." *Id*.

*Miranda* warnings are required for custodial interrogations. *See United States v. Black Bear*, 422 F.3d 658, 661 (8th Cir. 2005). "The ultimate question in determining whether a person is in 'custody' for purposes of *Miranda* is 'whether there is a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.'" *United States v. Giboney*, 863 F.3d 1022, 1027 (8th Cir. 2017) (quoting *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004)). "Interrogation includes not only express questioning by an officer, but also any words or actions that 'police should know are reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Ochoa-Gonzalez*, 598 F.3d 1033, 1038 (8th Cir. 2010) (quoting *Holman v. Kemna*, 212 F.3d 413, 417 (8th Cir. 2000)). The Eighth Circuit has recognized that "[t]he Supreme Court has analogized roadside questioning during a traffic stop to a *Terry* stop, which allows an officer with reasonable suspicion to detain an individual in order to ask 'a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.'" *United States v. Rodriguez-Arreola*, 270 F.3d 611, 617 (8th Cir. 2001) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)). "A request for routine information necessary for basic identification purposes is not interrogation under *Miranda*, even if the information turns out to be incriminating." *United States v. McLaughlin*, 777 F.2d 388, 391 (8th Cir. 1985). Therefore, *Miranda* warnings are not needed for persons detained for a *Terry* stop. *United States v. Pelayo-*

*Ruelas*, 345 F.3d 589, 592 (8th Cir. 2003). Immigration enforcement officers also possess statutory authority to "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States" without obtaining a warrant. 8 U.S.C. § 1357(a).

Based on my de novo review, I agree with Judge Williams. Callison asked Lopez-Tubac for his name, his country of citizenship and whether he had permission to be in the United States. Doc. No. 29 at 4. These questions were related to Callison's purpose for the stop, which was to determine whether defendant was the target of his investigation who was suspected of being in the United States illegally. After Lopez-Tubac admitted he was a citizen of Guatemala and did not have permission to be in the United States, a different agent asked for Lopez-Tubac's identification and took his fingerprints, which confirmed Lopez-Tubac was not the target but alerted officers that Lopez-Tubac had previously been charged with an immigration offense. As the Government points out, there was probable cause to administratively arrest Lopez-Tubac upon his admission that he did not have permission to be in the United States. *See* Doc. No. 24-1 at 7-8. Callison's questions were within the scope of gathering biographical information and allowed by the statutory authority given to immigration enforcement officers. Therefore, the information provided by Lopez-Tubac was not obtained in violation of *Miranda*.

### C. Inventory Search After Arrest

Lopez-Tubac next objects to Judge Williams' conclusion that the search and inventory of his belongings was not a pretext by ICE meant to uncover further incriminating evidence. Lopez-Tubac states that his property was not properly inventoried according to ICE policy. Specifically, he argues that ICE inventoried only "1 wallet" and "1 cellphone" without inventorying documents, funds or additional property within the wallet. Doc. No. 39 at 7. These items would have included Lopez-Tubac's Guatemalan consular identification card and his employee photo identification for a business in Shell Rock, Iowa, which ICE had located during the search. He argues

the failure to list this evidence suggests that the search was a ruse to discover incriminating evidence. *Id.* (citing *United States v. Smith*, 715 F.3d 1110, 1117 (8th Cir. 2013)).

Judge Williams concluded that the search and inventory of Lopez-Tubac's belongings was an administrative procedure rather than pretext for uncovering incriminating evidence. Doc. No. 29 at 12. He noted that Lopez-Tubac's belongings were itemized on a standardized form and Lopez-Tubac was required to acknowledge the accuracy of the form and sign it. *Id.* He further stated that ICE agents had enough evidence from the initial stop to arrest and charge Lopez-Tubac or investigate further. *Id.* This evidence included Lopez-Tubac's admission to being in the country without permission and the driver's statement that Lopez-Tubac was employed at a Shell Rock business. *Id.* Judge Williams found it unlikely that ICE agents would violate Lopez-Tubac's rights in hopes of finding additional evidence. *Id.*

Lopez-Tubac essentially takes issue with: (1) whether Lopez-Tubac's property should have been inventoried at the ICE office as opposed to the ultimate facility for detention and (2) the lack of specificity of the inventory record, which he contends is indicative of an improper motive. The Government argues the inventory search adhered to policy, and, in any event, would have eventually been discovered through lawful means. *See* Doc. No. 26. The inevitable discovery (or independent source) doctrine provides that suppression of evidence is not necessary if the Government proves by a preponderance of the evidence that: "(1) there is a reasonable probability the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." *United States v. Thomas*, 524 F.3d 855, 858 (8th Cir. 2008).

The ICE policy provided by the Government is silent as to the required specificity for listing a detainee's property on the standardized inventory form. *See* Doc. No. 26-1 (providing that "[e]ach detainee's funds, valuables, baggage and personal property shall

be inventoried, receipted, stored and safeguarded for the duration of their detention."). The policy does not state whether the contents of a wallet should be listed beyond "funds." Regardless of whether DO Callison's search of the contents of the wallet, including Lopez-Tubac's employee photo ID, went beyond the scope of the inventory search, I agree that the inevitable discovery doctrine applies in this case. Callison had questioned the driver of the vehicle, who stated that he and Lopez-Tubac were heading to work in Shell Rock, Iowa, and identified the name of the business at which they worked. Therefore, Callison was aware of Lopez-Tubac's place of employment prior to conducting the inventory search. Callison testified that he would have followed up on this information even without finding the employee ID in the wallet because Lopez-Tubac had admitted he did not have permission to be in the United States. For these reasons, and the additional reasons provided in the R&R, I find that the circumstances of the inventory search do not require suppression of the employee ID.

## IV. CONCLUSION

For the reasons set forth herein:

1. I **accept** Judge Williams' report and recommendation (Doc. No. 29) without modification.

2. Pursuant to Judge Williams' recommendation, defendant's motion (Doc. No. 22) to suppress is **denied**.

**IT IS SO ORDERED.**

**DATED** this 21st day of August, 2018.

_____
Leonard T. Strand, Chief Judge